J-A26035-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SHARMIL MCKEE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL K. PEARSON | : | No. 679 EDA 2022 |

Appeal from the Order Entered April 26, 2022
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  11-05994,
PACSES #553112291

BEFORE:  BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                   **FILED JANUARY 3, 2023**

Sharmil McKee (Mother) appeals from the April 26, 2022[1] order of the Court of Common Pleas of Philadelphia County (trial court) denying her exceptions and entering a final child support determination.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court orally denied Mother's exceptions on December 8, 2021, but a written order was not immediately docketed.  Father filed his notice of appeal on February 22, 2022, within 30 days of receiving the written order in the mail.  Following orders from this Court, the trial court entered the support order on the docket on April 26, 2022.  We will treat the premature notice of appeal as timely filed.  **See** Pa. R.A.P. 905(a)(5) ("[A] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").

**I.**

We glean the following facts from the certified record and the trial court's opinion. Mother and Michael K. Pearson (Father) have one child, C.M., and Father was previously ordered to pay Mother $1,021.67 per month in support. On October 23, 2017, Mother filed a petition to modify the support order alleging Father's income had increased while her own had decreased. The matter proceeded to a hearing in front of Support Hearing Officer (SHO) Wayne Bennett (SHO Bennett) over the course of five days in 2018 and 2019.

At the hearings, Mother sought to establish that Father's actual income was greater than his reported salary as the President and sole shareholder of Union Packaging, LLC (Union), a registered S-corporation. Father had owned Union since 1999 and testified that he earned a salary of approximately $146,000 annually. He did not receive any additional income from Union. Union reported taxable income of approximately $665,751 in 2017 but Father testified that he did not personally take home that amount. He received additional miscellaneous income of over $10,000 and made charitable donations of over $15,000 that year. Finally, Father paid his former spouse approximately $100,000 per year in distributions from Union under an equitable distribution order, as Union was a marital asset.[2] Based on this

_____

[2] Mother and Father were never married and Father's former spouse is not a party to this action.

testimony, SHO Bennett calculated Father's available income for support purposes as approximately $175,000.

On the first day of the hearing, Mother testified that she was unemployed due to health issues but had previously practiced law as a solo practitioner earning $38,000. She had earned an MBA in 2014 and was in the process of completing a Ph.D. in business, but had not been active in school for over a year due to her health condition. By the final day of the hearing over a year later, Mother had obtained a job as a compliance officer earning $85,000 annually. SHO Bennett concluded that Mother had an earning capacity of $75,000 annually from the date of the petition until she started her new job.

Mother provided healthcare for C.M. initially through Medicaid and later through her employment. Under the parties' custody order, Mother was responsible for C.M.'s schooling expenses. Mother testified that C.M. would be attending Miquon School with a partial scholarship and that she would pay $11,000 per year for his education.

SHO Bennett additionally reviewed each party's expenses, assets and obligations and determined that no deviation from the support guidelines was appropriate. He recommended that Father be ordered to pay support of $1,199.98 per month from the date of the modification petition until the date Mother obtained employment, at which point the award would be adjusted to $1,180.06 monthly. He ordered Father to pay $50 per month toward arrears.

Mother timely filed exceptions arguing that SHO Bennett had erred in calculating her earning capacity without sufficient factual support and without considering her health conditions and disability. She further argued that he had erred by failing to include all of Union's taxable income in Father's income. Finally, she contended that an upward deviation from the support guidelines was appropriate based on Union's total business value, C.M.'s tuition costs and the difference between the parties' income.

Following argument, the trial court remanded the case for the SHO to determine whether Union's taxable income was cash flow income to Father and whether Union's business valuation was an appropriate basis for an upward deviation from the support guidelines. It denied the remainder of Mother's exceptions. The trial court asked the parties which SHO the matter should be remanded to and Mother requested SHO Bennett. Father requested SHO Michael Pandolfi (SHO Pandolfi), who had handled the case when prior support orders were entered. The trial court ordered the case be remanded to either SHO Bennett or SHO Pandolfi depending on scheduling availability.

Mother and Father then proceeded to a remand hearing in front of SHO Pandolfi. Mother called certified public accountant John McGovern (McGovern) as an expert witness to testify regarding Father's income from Union and the total value of the business. McGovern's opinions were based on his review of Father's personal 2017 tax return and Union's 2017 tax return. Union's tax return listed compensation to officers totaling $148,336 for that year and

Father's personal return listed $143,841 in salary from Union. Union made $271,821 in distributions that year. Union's total reported income was $654,814, which McGovern explained was subject to taxation regardless of whether it was distributed. After reviewing the company's assets, inventories and receivables, he concluded that it could pay up to $619,731 in additional distributions based on its bank account balance. He opined that the company would likely not pay out that much due to upcoming expenses and obligations and was not aware of any covenants that might impact how much money Union retained or distributed.

McGovern also testified that he calculated Union's value as a company by looking at its book value, assets and liabilities. He believed that Union had bought out a prior shareholder for $1,045,000. He estimated Union's value at three million dollars but clarified that there had been a recent sale of the business and he did not know the purchase price. He further stated that he had not been engaged to provide a valuation of the business.

Father testified that the reported $665,751 in profit was an "accounting measure" and he was required to pay tax on that amount. N.T., 12/10/20, at 37. He testified that part of Union's distributions in 2017 was used to pay his former spouse in compliance with their equitable distribution order. He said that Union consistently used an accrual method of accounting and did not alter its accounting methods in 2017. Finally, he said that various loan covenants governed how much money could be distributed from the company.

SHO Pandolfi issued a report finding that Union's taxable income was not distributed in full to Father and should not be included in calculating support. He also determined that Union's valuation was not a proper basis for deviation from the support guidelines because Father could only realize that financial gain through selling the business. Accordingly, SHO Pandolfi recommended that SHO Bennett's proposed support order be made final.

Mother timely filed exceptions challenging both findings. Prior to the hearing on exceptions, she filed a new petition to modify the support order. The Pennsylvania Automated Child Support Enforcement System (ePACSES) Intake Unit sent her a letter stating that it could not process the request because a hearing was scheduled in the case. It advised her to "wait for the outcome of [the] hearing before any further action [could] be taken." **See** Supplemental Record, 8/16/22, Exhibit 2, Case Status, 4/8/21.

The trial court denied the exceptions following argument. At that time, Mother attempted to argue that SHO Pandolfi should have considered the sale of Union, which occurred in June 2019, when calculating Father's support obligation. The trial court responded that SHO Pandolfi was only reviewing Father's income as of the date of the October 23, 2017 modification petition, and that any changes that occurred thereafter would have to be raised in a separate petition. Mother said that she had attempted to file an additional modification petition following the sale of Union but the Clerk of Courts had improperly declined to accept the filing while her exceptions were pending.

The trial court responded that there was no final order of support so another modification petition would be premature, but that Mother could move for modification once the instant petition was resolved.

At that juncture, Mother inquired as to why the trial court had rescheduled the exceptions hearing, which occurred approximately one year after the remand hearing. The trial court responded that it was responsible for all proceedings in the matter under the consolidated case management (CCM) order so that the litigation would not proceed piecemeal in front of different jurists. It had rescheduled the hearing due to various issues in the courthouse. Mother accepted the explanation without objection.

Regarding the second exception, Mother argued that SHO Pandolfi should have taken the sale of Union into account when deciding whether an upward deviation from the guidelines was appropriate. When the trial court again stated that only the circumstances as of 2017 were at issue, Mother argued that the petition to modify had been pending for several years and that the sale had occurred before the remand hearing. The trial court responded that the guideline award was "relatively generous" and asked why an upward deviation was justified based on the facts available to SHO Pandolfi at the hearing.[3] N.T., 12/8/21, at 66. Mother replied that the standard for deviation was based on "the entirety of the situation." *Id.* at 67. In response,

---

[3] No evidence regarding the sale was introduced at the remand hearing.

Father attempted to argue that the trial court should consider Mother's bankruptcy proceedings, which discharged Father's past overpayment of child support as debt. Mother objected and the trial court stated that it would not consider the bankruptcy proceedings because SHO Pandolfi had sustained Mother's objection to their admission at the remand hearing. Mother made no further argument on the exceptions.

The trial court denied the exceptions and made the interim support order a final order of court. Mother appealed and she and the trial court have complied with Pa. R.A.P. 1925.[4]

**II.**

Mother sets forth 14 questions in her brief:

1. Did the trial court err in failing to allow Mother to file a petition for modification after the sale of Father's multi-million dollar

---

[4] Our standard and scope of review of a child support order is well-established:

> When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of the discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused. In addition, we note that the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests.

***Sichelstiel v. Sichelstiel***, 272 A.3d 530, 534 (Pa. Super. 2022) (citation omitted).

business that occurred during the five years that this petition was pending before the trial court and before the court entered a final order on Mother's 2017 petition?

2. Should the trial court had refused to address the fact that Father sold his half-million home and purchased a $1.8 million home during the five years that this petition was pending before the trial court and before the court entered a final order on Mother's 2017 petition?

3. Did the trial court err in failing to allow the 2019 sale of his business into the record when the sale was a matter of public record, and the trial court failed to take judicial notice of the sale of the business?

4. Did the trial court err when it failed to permit financial information about Father's divorce into this child support case when it was relevant?

5. Should the trial court have deducted the noncustodial parent's business net income of over $600,000 from child support calculations?

6. Should the trial court have applied an upward deviation in a case where the noncustodial parent was the sole owner of a multi-million-dollar business, but support was calculated based on his $158,000 salary that he chose to withdraw from his business?

7. Should the trial court have applied an upward deviation in a case where the custodial parent is paying private school tuition, and the noncustodial parent is not contributing to tuition, but the noncustodial parent's multi-million business and $1.8 million home were not included in the child support calculations?

8. Should the trial court have declined an upward deviation under 231 Pa. Code § 1910.16-5 using a non-factor test not delineated in the rules and substituting a subjective test for the delineated factors in the statute to determine that child support was generous and thus upward deviation was unnecessary?

9. Did the trial court err when it did not return the matter to the original master?

10. Did the trial court err by retaining the file in the [c]ourt's chambers for the past decade?

11. Did the trial court err in maintaining exclusive jurisdiction for ten years, prohibiting other judges from ruling on the case, and causing several years-long delays?

12. Did the court err in failing to sanction counsel for using an improper bankruptcy discharge argument?

13. Did the court err in creating an appearance of partiality?

14. Did the court err in communicating with the prothonotary of the Superior Court requesting dismissal of appeal?

Mother's Brief at 6-8 (suggested answers omitted).[5]

Initially, we note that Mother's brief does not conform to our Rules of Appellate Procedure. While she sets forth 14 questions in her statement of questions involved, her argument section is not divided into 14 sections addressing each question with reference to pertinent authority. Pa. R.A.P. 2116, 2119(a). Instead, her argument generally attempts to target the issues raised in her statement of questions involved but presents them out of order, raises new issues or combines issues while only obliquely referring to others.

_____

[5] Mother raises an additional issue in the argument section of her brief: "The testimony during the 12/10/2020 hearing was stale and required a new hearing." Mother's Brief at 32. She does not cite to a point in the record where she requested an entirely new support hearing, nor does our review of the record reveal one. Further, she did not raise this issue in her concise statement pursuant to Pa. R.A.P. 1925(b). Accordingly, it is waived. *See* Pa. R.A.P. 302(a); Pa. R.A.P. 1925(b)(4)(vii). ***Sutliff v. Sutliff***, 543 A.2d 534 (Pa. 1988), which Mother cites in support, does not compel a different conclusion. Nothing in ***Sutliff*** suggests that the trial court had an obligation to order a new hearing without a request by either party. ***See id.*** at 537.

She does not consistently cite to the record or identify where certain issues were raised in the trial court. Pa. R.A.P. 2119(c), (e). Father urges us to dismiss the appeal based on these deficiencies. Father's Brief at 12-13.

As a general matter, "[a]ppellate briefs must conform materially to the requirements of the Pennsylvania Rules of Appellate Procedure, and this Court may quash or dismiss an appeal if the defect in the brief is substantial." **Commonwealth v. Tchirkow**, 160 A.3d 798, 804 (Pa. Super. 2017); **see also** Pa. R.A.P. 2101. "However, as a practical matter, this Court quashes appeals for failure to conform to the Rules of Appellate Procedure only where the failure to conform to the Rules results in the inability of this Court to discern the issues argued on appeal." **Kern v. Kern**, 892 A.2d 1, 6 (Pa. Super. 2005). Here, Mother's failure to conform her brief to the Rules has not hampered our review and we will consider the merits of her claims.

## A.

Mother first challenges the Clerk of Court's refusal to accept her 2021 petition to modify the support order that she filed while the exceptions to the remand hearing in front of SHO Pandolfi were still pending. As discussed *supra*, after a final support order was entered on October 13, 2017, Mother initially sought modification of the support order on October 23, 2017. Following hearings before SHO Bennett, an interim modified support order was entered on December 10, 2019. While Mother's second set of exceptions to the interim order was pending, she attempted to file a second modification

petition requesting modification of the October 13, 2017 final support order. The ePACSES Intake Unit rejected the petition because the hearing on her second set of exceptions was pending.

The trial court did not abuse its discretion by denying relief on this claim. Mother's petition sought to modify the prior final support order which had already been superseded by the interim support order entered in December 2019.[6] *See* Pa. R. Civ. P. 1910.12(e) (following a hearing in front of SHO, the trial court "shall enter an interim order consistent with the proposed order of the hearing officer"), (h) (interim order remains in effect while exceptions are pending). Mother cannot seek to modify an order that was no longer in effect. Her first claim is meritless.

**B.**

We consider Mother's next two claims together. Mother argues that the trial court abused its discretion by failing to consider the sale of Father's house and business that took place while her modification petition was pending. However, while she identifies the sale of Father's home in her statement of

---

[6] We disagree with the trial court's assertion that a litigant cannot petition to modify an interim support order. Trial Court Opinion, 6/30/22, at 6-7; *see* 23 Pa.C.S. § 4352(a) ("A petition for modification of a support order may be filed *at any time* and shall be granted if the requesting party demonstrates a substantial change in circumstances." (emphasis added)); *Summers v. Summers*, 35 A.3d 786, 789 (Pa. Super. 2012) (citations omitted). Nevertheless, we may affirm the trial court's order on any basis. *Prieto Corp. v. Gambone Const. Co.*, 100 A.3d 602, 606 (Pa. Super. 2014).

questions involved as a basis for increasing his support obligation, she does not present any argument related to this claim in her brief other than a passing reference to the sale in her argument in favor of an upward deviation from the guidelines. **See** Mother's Brief at 40. Accordingly, it has been abandoned and we do not address it further. **Green v. Green**, 69 A.3d 282, 285 n.3 (Pa. Super. 2013) (finding claim waived for failure to develop it in argument section of brief). Regarding the sale of Union, Mother addresses this issue in her brief only in the context of her claim that the trial court relied on a stale record when evaluating the support order and should have ordered a new hearing. Mother's Brief at 32-36. As explained *supra*, this claim is also waived. Note 5, *supra*. Finally, after a review of the record, we agree with the trial court that Mother did not present or develop these claims at the support hearings or in her exceptions. Trial Court Opinion, 6/30/22, at 7-8; **see also** Pa. R.C.P. 1910.12(f) ("Matters not covered by exceptions are deemed waived unless, prior to entry of the final order, leave is granted to file exceptions raising those matters."). They are waived on that basis as well.

### C.

Next, Mother argues that the trial court abused its discretion by failing to allow discovery into Father's divorce and equitable distribution action. At the support hearings, Father introduced his equitable distribution order to show that Union made a $100,000 distribution in 2017 in accordance with that order. In her abbreviated argument on this issue, Mother contends only that

the equitable distribution matter was relevant to impeach Father under Pennsylvania Rule of Evidence 401, which sets forth the test for relevant evidence. *See* Mother's Brief at 43. At the second exceptions hearing, Mother argued that she should have been permitted full discovery of Father's equitable distribution action to verify whether payments were made for those purposes.[7] N.T., 10/8/21, at 24-27. Because Mother did not articulate any specific basis to justify discovery into Father's entire equitable distribution action, particularly when the relevant order was submitted into evidence already, the trial court determined that the request was entirely speculative. *See* Trial Court Opinion, 6/30/22, at 9-10. Mother similarly presents no argument on appeal to support her assertion that anything in the file would contradict the final order. Accordingly, we discern no abuse of discretion in the trial court's reasoning.

**D.**

In her next issue, Mother contends that the trial court abused its discretion by failing to consider Union's total reported profits as Father's income for the purposes of calculating his support obligation under the

---

[7] Mother and the trial court reference an order issued earlier in the case's history that denied Mother discovery into this file. The order and any related filings are not contained in the certified record so we may not consider them. *See Commonwealth v. Rush*, 959 A.2d 945, 949 (Pa. Super. 2008) ("This Court does not rely on items *dehors* the record, such as assertions in an appellate brief or a trial court opinion reviewing a case on appeal.").

guidelines.[8]  Father testified consistently and his personal tax return corroborated that he received approximately $150,000 in compensation from Union for his position as an officer.  SHO Bennett adjusted his income upward based on additional miscellaneous income and charitable donations for a total income of $175,258.  Mother argues that because Father is the sole shareholder of Union, its 2017 retained earnings of $654,814 should be included in the calculation of Father's income.[9]

_____

[8] The trial court first concluded that this issue was barred by the doctrine of collateral estoppel because in Mother's prior appeal, this Court concluded that Father was not sheltering income through Union's depreciation tax deductions. **See** Trial Court Opinion, 6/30/22, at 10-11 (citing **S.M. v. M.K.P.**, 1497 EDA 2014, at *8-10 (Pa. Super. Nov. 24, 2015) (unpublished memorandum)).  In **Mackay v. Mackay**, 984 A.2d 529 (Pa. Super. 2009), this Court rejected a similar argument that the trial court was bound by its former order under the law of the case doctrine when determining a party's income for child support purposes.  We held that in support cases, the trial court retains jurisdiction to alter a support order at any time based on a material and substantial change in circumstances, and that a party's income is a factual finding that can change based on those circumstances.  **Id.** at 538 n.3, 541.  Here, the related doctrine of collateral estoppel requires that "the issue decided in the prior case is identical to one presented in the later case."  **Weissberger v. Myers**, 90 A.3d 730, 733 (Pa. Super. 2014) (internal quotations & citation omitted).  The issue presented here and in Mother's prior appeal are fact-specific inquiries into whether Father's income should be increased based on Union's profits.  A prior factual determination regarding Union's income or assets may change based on changes in accounting methods or profit in intervening years.  Because these questions require credibility determinations and new factual findings based on an alleged change in circumstances, they are not identical to the issues in the prior appeal and collateral estoppel does not apply.  **See Mackay**, **supra**.

[9] Mother also argues that Union's business deductions exceeding one million dollars in 2017 should have been considered when calculating Father's income.  Moreover, she argues that Father's income includes the $271,821 in
*(Footnote Continued Next Page)*

Initially, we note that Mother's exceptions challenged the SHO's failure to include Union's 2017 income of $665,751, which was passed through to Father's personal tax return, in its calculation of his income.[10] On appeal, she now argues that retained earnings of $654,814 should have been included in Father's income.[11] Father contends that this discrepancy requires waiver. Father's Brief at 22. However, our review of the record and her argument on appeal reveals that she has maintained the same position throughout these proceedings: that Father declined to distribute a substantial portion of Union's total earnings in order to shelter that money from being counted as his income for support purposes. Thus, while the precise figure she cites in her argument has changed, we decline to find waiver on that basis.

Union is an S-corporation that avoids corporate tax liability through a flow-through income scheme requiring Father, the sole shareholder, to report the business income on his personal tax return. *Sichelstiel v. Sichelstiel*, 272 A.3d 530, 532 (Pa. Super. 2022). An S-corporation is not required to

_____

distributions made by Union in 2017, and that the equitable distribution payment of $100,000 should not have been deducted from his net income. She did not raise these arguments in her exceptions to the interim order and they are waived. Pa. R.C.P. 1910.12(f); Pa. R.A.P. 302(a).

[10] This figure is taken from Schedule E of Father's personal 2017 tax return.

[11] This figure is taken from Schedule M-1 of Union's 2017 business tax return.

distribute profits to shareholders for them to pay taxes on those earnings; it may choose to retain those earnings in the company. ***See id.*** at 535.

Our law is clear that income from a business is included in the calculation of an obligor's support obligation. 23 Pa.C.S. 4302; Pa. R.C.P. 1910.16-2(a). However, "[t]hat income must reflect actual available financial resources and not the oft-time fictional financial picture which develops as the result of depreciation deductions taken against . . . income as permitted by the federal income tax laws. Otherwise put, 'cash flow' ought to be considered and not federally taxed income." ***Cunningham v. Cunningham***, 548 A.2d 611, 612-13 (Pa. Super. 1988) (quoting ***Commonwealth ex rel. Hagerty v. Eyster***, 429 A.2d 665, 668-69 (Pa. Super. 1981). In ***Sichelstiel***, we set forth the law regarding business income as follows:

> "[T]he owner of a closely-held corporation cannot avoid a support obligation by sheltering income that should be available for support by manipulating salary, perquisites, corporate expenditures, and/or corporate distributions amounts." [***Fennell v. Fennell***, 753 A.2d 866, 868 (Pa. Super. 2000).] "By the same token, however, we cannot attribute as income funds ***not actually available*** to or received by the party." ***Id.*** (emphasis added).
>
> Because the father [in ***Fennell***] did not actually receive corporate distributions, nor did the father have the ability to control whether the company would issue distributions or retain its earnings, we concluded that the trial court erred when it considered that income. ***Id.*** at 869. We clarified, however, that our holding did "not create a presumption that corporate retained earnings per se are to be excluded from available income for purposes of support calculations." ***Id.*** (footnote omitted). Rather, "in situations where the individual with the support obligation ***is able to control*** the retention or disbursement of funds by the corporation, he or she

> still will bear the burden of proving that such actions were 'necessary to maintain or preserve' the business."

*Sichelstiel*, *supra*, at 536 (emphasis in original). In *Sichelstiel*, the obligor held ownership shares in nine businesses and used virtually all of the cash flow he received from those businesses to pay taxes on the total flow-through income. *Id.* at 533. At the support hearing, there was no testimony as to his ability to control the companies' distributions or the entities' general practice regarding retained earnings. *Id.* at 537. Based on the obligor's minority ownership in the businesses, we concluded that the obligor did not have the burden of establishing whether retention of the flow-through income was "'necessary to maintain or preserve' the business." *Id.* at 538 (quoting *Fennell*, *supra*, at 869).

As Mother argues, this is not the case here. Father is the sole owner and shareholder of Union. SHO Bennett initially considered the inclusion of Father's pass-through income in his December 10, 2019 report in support of the interim order. Father testified that he drew a salary of approximately $140,000 annually from Union and did not take additional distributions so that his lifestyle would not change year to year. N.T., 8/2/18, at 38-39. He explained that Union consistently claimed depreciation tax deductions throughout its history and had distributed $100,000 pursuant to an equitable distribution order. He contended that there had been no change in circumstances since the parties had litigated Father's income in earlier support proceedings. SHO Bennett credited Father's testimony:

> The Master finds for the Obligor on this issue, as while the court must look beyond a corporate veil to determine actual cash flow for support purposes and determination (***Morris v. Bell***, 639 A.2d 846 (Pa. Super. 1993), ***Cunningham v. Cunningham***, 548 A.2d 611 (Pa Super. 1998), and ***King v. King***, 568 A.2d 627 (Pa. Super. 1989)), and where the Obligor has substantial control over the finances and business in which he is a controlling partner such as is the case here, the Master does not find that given the totality of the circumstances this Obligor has manipulated the timing and amount of personal income from his business to evade his support obligation.
>
> The Court has found that depreciation deductions, certain types of expenses, and even automobile expenses may be excluded as real income for support purposes, where these deductions reflect actual cash outlays. ***Holland v. Holland***, 663 A.2d 768 (Pa. Super. 1995); ***McAuliffe v. McAuliffe***, 613 A.2d 20 (Pa. Super. 1992).
>
> In the present case the Master does not find that the Obligor's capital outlays and business deductions are an attempt to shelter income from the Court. The Master also finds that there has been no substantial changes in the Obligor's circumstances since the previous Master, and the Master therefore found for the Obligor in regards to this issue.

Report of Master in Support, 12/10/19, at 3 (cleaned up). Thus, SHO Bennett found Father credible and concluded he was not using Union's retained earnings to shelter income from his child support obligation.

Following argument on Mother's first set of exceptions, the trial court remanded the matter for the SHO to determine whether Union's total profit was, in fact, cash flow income available to Father. On questioning by SHO Pandolfi, Father testified that the reported $665,751 in profit was an "accounting measure" and "was not in anyone's bank account." N.T., 12/10/20, at 37. He testified that he was required to pay taxes on that

amount. He said that Union did not alter its accounting methods in 2017 or make any changes to how the company handled its cash flow and liabilities. Union had consistently used an accrual method of accounting. He further testified that Union was subject to loan covenants that "dictated what could be withdrawn from the business at any time." *Id.* at 75.

Mother's expert, McGovern, testified that he reviewed Union's and Father's tax returns from 2017 and limited his analysis of the cash flow to the compensation and distribution paid by Union. He discovered that Union had reported $143,841 in compensation paid and $271,821 in distributions. After reviewing Union's bank account, inventories and accounts receivables and payable, he concluded that Union had sufficient reserves to make additional distributions. He could not quantify the total amount Union would have been able to distribute and acknowledged that a corporation would need to retain cash for upcoming expenses. He did not know whether Union had additional covenants that would require it to retain money and did not interview Father to learn more about Union's distribution practices. Finally, he testified that the $665,751 figure reflected on Father's tax return was not cash flow income to Father, but rather Union's taxable income. He could not determine from the tax returns the purpose of the cash distributions.

After considering this testimony, SHO Pandolfi concluded that Union's 2017 income was not cash flow income available to Father for support purposes and recommended that SHO Bennett's interim order be made final.

Upon review of the full record of the proceedings in front of both SHOs, the trial court agreed. The record supports this determination. While Father was the sole shareholder of Union and was able to control its distributions, he testified that he took the same salary every year to maintain his lifestyle and that Union's accounting methods had not changed throughout its history.[12] Union retained profits in its bank account at the end of 2017 in accordance with these accounting methods and to comply with loan covenants requiring it to maintain cash reserves. Thus, there was no evidence presented that Father had access to the over $600,000 in profits that Union generated in 2017 as actual cash flow income. Based on the consistency of Union's accounting practices, which predate the support action, and Father's testimony regarding the business's practices, the trial court did not abuse its discretion in determining that Father was not using Union to shelter income from his support obligations.

**E.**

We address Mother's next three issues on appeal together, as they all challenge the trial court's denial of her request for an upward deviation from the support guidelines.[13] She contends that an upward deviation was

---

[12] Union was founded in 1999, well before C.M. was born and support proceedings were initiated.

[13] Collateral estoppel does not bar consideration of this claim. *See* note 8, *supra*.

appropriate because Father owned Union, a multi-million-dollar business, and a new home, while Mother was solely responsible for C.M.'s tuition. She argues that the trial court invented a new standard for assessing whether a deviation was appropriate by finding that the support award was "relatively generous" while failing to consider the required statutory factors. N.T., 12/8/21, at 66.

"[T]he support guidelines set forth the amount of support which a spouse or parent should pay on the basis of both parties' net monthly incomes ... and the number of persons being supported." Pa.R.C.P.1910.16–1(a). There is a rebuttable presumption that the guideline amount of child support is the correct amount. Pa.R.C.P.1910.16–1(d).

That said, "a court generally has reasonable discretion to deviate from the guidelines if the record supports the deviation." **Silver v. Pinskey**, 981 A.2d 284, 296 (Pa. Super. 2009). Rule 1910.16–5 addresses deviation from the guidelines as follows:

**(a) Deviation.**

(1) The trier-of-fact may deviate from the basic child support, spousal support, or alimony *pendente lite* obligation.

(2) If the trier-of-fact determines a deviation is appropriate based on the factors in subdivision (b), the trier-of-fact shall specify on the record or in writing:

    (i) the calculated basic child support, spousal support, or alimony *pendente lite* obligation;

    (ii) the reason for the deviation;

(iii) the findings of fact justifying the deviation;

(iv) the deviation amount; and

(v) in a spousal support or an alimony *pendente lite* action, the obligation's duration.

*Note:*  The deviation applies to the amount of the support obligation and not to the amount of income.

**(b) Factors.**  In deciding whether to deviate from the amount of support determined by the guidelines, the trier of fact shall consider:

(1) unusual needs and unusual fixed obligations;

(2) other support obligations of the parties;

(3) other income in the household;

(4) ages of the children;

(5) the relative assets and liabilities of the parties;

(6) medical expenses not covered by insurance;

(7) standard of living of the parties and their children;

(8) in a spousal support or alimony *pendente lite* case, the duration of the marriage from the date of marriage to the date of final separation; and

(9) other relevant and appropriate factors, including the best interests of the child or children.

Pa. R.C.P.1910.16–5.

The sole reason Mother cited in the trial court in support of an upward deviation from the support guidelines was her expert's valuation of Union at three million dollars.  Presumably, she is referencing factor five, "the relative assets and liabilities of the parties," as the factor supporting an upward

deviation. Pa. R.C.P.1910.16–5(b)(5). After examining the testimony at the remand hearing in front of SHO Pandolfi, the trial court concluded that Union's valuation did not compel an upward deviation.[14] McGovern testified that he was not retained to provide a formal valuation of Union and had only reviewed Father's personal 2017 tax return and Union's 2017 tax return in rendering his opinion. Thus, he could not base his opinion on any sale that occurred after the 2017 tax year, and he did not interview Father when researching his opinion. McGovern was only able to "surmise" based on review of these limited records that the business was worth three million dollars. N.T., 12/10/20, at 53. The trial court did not abuse its discretion in concluding that this tenuous valuation did not support a deviation from the guidelines under the totality of the circumstances, and the record belies Mother's claim that the trial court denied the exception based solely on the "relatively generous" nature of the guideline award.

Moreover, the trial court credited SHO Pandolfi's reasoning for rejecting the upward deviation and SHO Bennett's earlier factual findings regarding the parties' income, needs, obligations and assets and liabilities. Trial Court Opinion, 6/30/22, at 14-15, 17-18. While Mother presented evidence that she

---

[14] The trial court declined to consider any evidence of the actual sale of Union because the record at the remand hearing did not disclose the sale price and the sale occurred after the modification petition was filed. The trial court repeatedly informed Mother that she could file a new modification petition raising the issue of the sale once a final support order was entered.

paid $10,000 in tuition for C.M., the trial court noted that Mother had unilaterally elected to enroll C.M. in a private school and that the parties' custody order required her to pay all tuition expenses. *Id.* at 16-17. The record reflects that the trial court reviewed all evidence presented and considered all required factors before finding that an upward deviation was not warranted under the facts of this case. As a result, no relief is due.

**F.**

Next, Mother contends that the trial court erred by remanding the case to SHO Pandolfi for the hearing on Father's income and Union's valuation, rather than ordering the hearing to take place in front of SHO Bennett. We agree with the trial court that this issue is waived. When it remanded the matter for an additional hearing, the trial court noted that SHO Bennett and SHO Pandolfi had been involved in the case during its history and asked the parties if they had any preference as to which SHO should preside over the remand hearing. Mother preferred SHO Bennett; Father preferred SHO Pandolfi. The trial court stated that it would direct the matter to be listed in front of one of those SHOs. Mother did not object to this decision at that time, file a motion to have the matter transferred to SHO Bennett after the hearing was scheduled, or object in front of SHO Pandolfi at the time of the remand hearing. In absence of a timely, specific objection that would have allowed the trial court to address this matter in the first instance, Mother's claim is

waived.[15] *Summers v. Summers*, 35 A.3d 786, 790 (Pa. Super. 2012) (citing *Hong v. Pelagatti*, 765 A.2d 1117, 1123 (Pa. Super. 2000)); Pa. R.A.P. 302(a).

**G.**

We address Mother's next two issues on appeal together, as they both challenge the trial court's management of the case. Mother faults the trial court for retaining the physical file in this matter in its chambers since the inception of the case in 2012. She further contends that the trial court erred by maintaining exclusive jurisdiction over the case rather than allowing other jurists to preside over different proceedings and argues that the trial court's insistence on maintaining jurisdiction resulted in lengthy delays.

Again, Mother's claims are waived. The issue of the trial court's handling of the case and the numerous delays was addressed at the second exceptions hearing. Mother asked the trial court why the hearing had been rescheduled at the request of its chambers and why it had retained the case over the years. *See* N.T., 12/8/21, at 57-61. The trial court gave a lengthy explanation for the delays in scheduling the exceptions hearing and stated that it heard all

---

[15] In its opinion, the trial court explained that when the case was remanded, the earliest available date for the hearing was in front of SHO Pandolfi. Given the protracted nature of these proceedings, we discern no abuse of discretion in ordering the case to proceed at the earliest possible date. Moreover, Mother has not articulated any prejudice that she suffered by having the remand hearing proceed in front of SHO Pandolfi, who was familiar with her case. *See* Mother's Brief at 44-47.

petitions in the case due to a CCM order issued by the administrative judge. *Id.* Mother stated that she had thought the trial court had requested to keep the case and the trial court responded that it would preside over the case unless one of the parties filed a motion to remove the CCM order. Mother accepted this explanation without objection and did not file any motions to recuse the trial court or remove the CCM order. As a result, her claims are waived. **Summers**, **supra**; Pa. R.A.P. 302(a).

**H.**

Next, Mother claims that the trial court erred by failing to sanction Father *sua sponte* for referring to her bankruptcy proceedings during the second exceptions hearing. At the hearing on Mother's second set of exceptions, Father contended that Mother had additional income available to her in 2017 because approximately $37,000 in overpayment of child support by Father was discharged as debt in her personal bankruptcy action. Mother characterizes Father's reference to these events as an improper attempt to collect a debt that had been discharged in bankruptcy and faults the trial court for failing to impose sanctions. **See** Mother's Brief at 50 (citing **D'Happart v. First Commonwealth Bank**, 282 A.3d 704, 730 (Pa. Super. 2022)).

This claim is meritless. At the hearing, Father attempted to argue that Mother was not entitled to a deviation from the support guidelines because approximately $37,000 in overpayment of child support had been discharged in her bankruptcy proceedings. This was not an attempt to collect a debt that

had been discharged in bankruptcy, as Mother suggests. Mother immediately objected to this argument, and the trial court reviewed the transcript of the remand hearing and determined that SHO Pandolfi had found that the bankruptcy was irrelevant to the matters on remand. No further argument was made regarding the bankruptcy, the trial court stated that it could not consider it, and Mother did not request sanctions. N.T., 12/8/21, at 68-71. We agree with the trial court that Mother waived this issue.[16] Trial Court Opinion, 6/30/22, at 22-23; **Summers**, **supra**; Pa. R.A.P. 302(a).

## I.

Next, Mother argues that many of the above-mentioned alleged trial court errors created an appearance of partiality by the trial court. **See** Mother's Brief at 53-55. However, as the trial court notes, Mother did not seek recusal or otherwise raise an objection to the trial court's continued handling of the case in the lower court. Trial Court Opinion, 6/30/22, at 23.

---

[16] Additionally, the cases Mother cites in her argument on this point do not support her position. The quote she supplies from **Bisher v. Lehigh Valley Health Network, Inc.**, 265 A.3d 383 (Pa. 2021), is from a case out of the Massachusetts Supreme Court that our Supreme Court cited when reviewing the law in other jurisdictions. **See id.** (quoting **Rental Prop. Mgmt. Servs. v. Hatcher**, 97 N.E.3d 319, 333 (Mass. 2018)). **Commonwealth v. Africa**, 353 A.2d 855 (Pa. 1976), bears on a court's power to find parties before it in contempt for engaging in disruptive behavior. Neither case posits that it would be reversible error for a trial court to decline to sanction a party *sua sponte* for raising an argument that references another party's bankruptcy proceedings.

Our review of the record confirms this conclusion. Accordingly, this issue is waived. **Summers**, **supra**; Pa. R.A.P. 302(a).

**J.**

In her final claim, Mother argues that the trial court erred by requesting that this Court quash her appeal as untimely filed. As explained in note 1, *supra*, we have already concluded that her appeal was timely filed after a delay in docketing the final order of support. The trial court has additionally acknowledged its error in assessing the timeliness of the appeal. Trial Court Opinion, 6/30/22, at 3-4, 23-24 (explaining that it was unaware that the written order had not been docketed until it received notice from this Court). Accordingly, any claim of error on this matter is moot.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/3/2023

- 29 -